RODNEY GILSTRAP, UNITED STATES DISTRICT JUDGE
Before the Court is Google LLC's ("Google") Second Renewed Motion to Dismiss or, in the Alternative, Transfer under 28 U.S.C. § 1406 for Improper Venue. (Dkt. No. 125) ("the Motion"). Having considered the Motion, the Court is of the opinion that it should be DENIED for the reasons contained herein.
I. PROCEDURAL BACKGROUND
SEVEN Networks, LLC, ("SEVEN") filed suit against Google on May 17, 2017, alleging, inter alia , patent infringement. (Dkt. No. 1). On August 8, 2017, Google filed a Motion to Dismiss under Rule 12(b)(3). (Dkt. No. 25). In response, SEVEN filed the Amended Complaint that is the subject of the present motion. (Dkt. No. 34). On September 12, 2017, Google filed a Renewed Motion to Dismiss ("Second Motion to Dismiss"), again under Rule 12(b)(3). In response, along with its opposition to the Second Motion to Dismiss, SEVEN filed a Contingent Motion for Leave to Conduct Venue Discovery. (Dkt. No. 77).
On December 22, 2017, the Court entered a Venue Discovery Order, which directed the parties to conduct discovery on Google's venue motions by February 22, 2018, and directed Google to refile its venue motions no later than two weeks after the close of venue discovery. (Dkt. No. 107). The Court then granted the Parties'
*938 motion to extend venue discovery to March 1, 2018. (Dkt. No. 115). Following the close of venue discovery, Google filed the instant Motion and a related Motion to Transfer Venue to the Northern District of California. (Dkt. Nos. 125, 126). The Court held a hearing on the instant Motion on June 1, 2018. (Dkt. No. 186).
II. APPLICABLE LAW
In today's post- TC Heartland world, venue law in patent cases continues its development. See generally In re Cray Inc. , 871 F.3d 1355 (Fed. Cir. 2017) ; In re Micron Tech., Inc. , 875 F.3d 1091 (Fed. Cir. 2017) ; In re HTC Corp. , 889 F.3d 1349 (Fed. Cir. 2018) ; In re BigCommerce, Inc. , 890 F.3d 978 (Fed. Cir. 2018) ; In re ZTE (USA) Inc. , 890 F.3d 1008 (Fed. Cir. 2018) ; and In re Intex Recreation Corp. , No. 2018-131, 2018 WL 3089215 (Fed. Cir. June 13, 2018).
Venue in patent infringement actions is defined by 28 U.S.C. § 1400(b). There is no doubt that any analysis of venue under 28 U.S.C. § 1400(b)"begin[s] with the language of the statute." In re BigCommerce , 890 F.3d at 982 (citing Mallard v. U.S. Dist. Court for the S. Dist. of Iowa , 490 U.S. 296, 300, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) ). Section 1400(b) of Title 28, United States Code states:
Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.
The Federal Circuits' first, and most general, guidance on how a district court should approach this venue statute was provided by In re Cray, 871 F.3d 1355. There, the Federal Circuit struck down this Court's suggested test as "not sufficiently tethered to this statutory language" and for "fail[ing] to inform each of the necessary requirements of the statute." Id. at 1362. The Circuit continued:
In deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts. The "requirements" listed above and discussed below inform whether there exist the necessary elements, but do not supplant the statutory language. We stress that the analysis must be closely tied to the language of the statute.
Id. Accordingly, district courts must hew closely to an analysis which is guided by the language of the statute.[1]
Beyond this admonition, the Federal Circuit provided additional guidance on what it believed to be the major requirements of the statutory language; these lodestars guide district courts in their application of the statute to case specific facts. Specifically, the Federal Circuit held that " § 1400(b) requires that 'a defendant has' a 'place of business' that is 'regular' and 'established.' All of these requirements must be present." Id. These requirements were further refined: "the first requirement is that there must be a physical place in the district"; "[t]he second requirement ... is that the place must be a regular and established place of business"; and "the third requirement ... is that the regular and established place of business must be the place of the defendant." Id. at 1362-63 (internal quotation marks omitted). Having *939 set forth a three-part test[2] for the application of the statute, the Federal Circuit then examined each identified requirement in greater detail.
As to the requirement that there is a "physical place in the district," the Federal Circuit noted that a "place" is defined as "a building or a part of a building set apart for any purpose or quarters of any kind from which business is conducted." Id. at 1362 (citing William Dwight Whitney, THE CENTURY DICTIONARY, 4520 (Benjamin E. Smith, ed. 1911); Place , BLACK'S LAW DICTIONARY (1st ed. 1891) ) (internal quotations omitted). The Federal Circuit further noted that the statute "cannot be read to refer merely to a virtual space or to electronic communications from one person to another." In re Cray , 871 F.3d at 1362 (emphasis added).[3] ,[4] ,[5]
*940 Turning to the requirement that the place "must be a regular and established place of business," the Federal Circuit has instructed that the place of business must be "regular," by, for example, operating in a "steady, uniform, orderly, and methodical manner." In re Cray , 871 F.3d at 1362 (cleaned up) (citing THE CENTURY DICTIONARY , supra , at 5050). This business may not be temporary or for some special work or particular transaction; a single act does not constitute business, but a series of such acts does. Id. (citations omitted).[6] The Federal Circuit noted that the "established" limitation "bolsters this conclusion," as it requires the business not be "transitory" and possess "sufficient permanence." Id. at 1363. "[W]hile a business can certainly move its location, it must for a meaningful time period be stable, established." Id. Fulfillment of this requirement is closely linked to the third requirement. See In re ZTE , 890 F.3d at 1015.
The third requirement is that "the regular and established place of business must be the place of the defendant." In re Cray , 871 F.3d at 1363. "[T]he defendant must establish or ratify the place of business." Id. at 1364. In undertaking this inquiry, the Federal Circuit provided a number of relevant considerations to assist the district courts in their analyses, including "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place," "whether the defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed or sold from that place," and whether "the defendant itself holds out a place for its business." Id. However, "it must be a place of the defendant , not solely a place of the defendant's employee." Id. (emphasis added). "[A] defendant's representations that it has a place of business in the district are relevant to the inquiry." Id. These representations might include "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated *941 with or on the building itself." Id. at 1363-64. However, such ratification alone is not enough, as "the mere fact that a defendant has advertised that it has a place of business or has even set up an office is not sufficient; the defendant must actually engage in business from that location." Id. The Circuit further counseled district courts to readily compare "the nature and activity of the alleged place of business of the defendant in the district" to "that of other places of business of the defendant in other venues." Id.
The Federal Circuit elaborated on this specific requirement recently in In re ZTE. 890 F.3d 1008. In determining whether an alleged place of business was of the defendant, the Circuit encouraged the district court to consider, on remand, "whether [the defendant] itself possesses, owns, leases, or rents the office space for the call center or owns any of the equipment located there," "whether any signage on, about, or relating to the call center associates the space as belonging to [the defendant]," and "whether the location of the call center was specified by [the defendant] or whether [the defendant's call center contractor] would need permission from [the defendant] to move its call center outside of the Eastern District of Texas or to stop working for [the defendant]." Id. at 1015.
"[A]s a matter of Federal Circuit law [ ], upon motion by the Defendant challenging venue in a patent case, the Plaintiff bears the burden of establishing proper venue." Id. at 1013.
Having summarized the law of venue as it currently exists, the Court turns now to the specific facts of this case and the application of that law thereto.
III. DISCUSSION
As discussed above, venue lies only "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). Google argues that it meets neither requirement.
It is undisputed that when this action was filed,[7] Google was incorporated in Delaware and therefore "resided" in Delaware, not in Texas. (Dkt. No. 125 at 3 (citing Dkt. No. 1 at ¶ 2) ); see generally Dkt. No. 141); see also TC Heartland LLC v. Kraft Foods Group Brands LLC , --- U.S. ----, 137 S.Ct. 1514, 1521, 197 L.Ed.2d 816 (2017). SEVEN does not dispute this. Accordingly, Google's residence cannot provide a basis for venue in this District.
In order for proper venue in this action to lie in this District, Google must have committed acts of infringement and have a regular and established place of business in this District. Google avers that SEVEN cannot demonstrate that it has committed acts of infringement "in this district for at least some of the asserted patents." (Dkt. No. 125 at 17). Google also avers that SEVEN cannot demonstrate that it has a regular and established place of business within this District. (Id. at 7).
A. Acts of Infringement[8] *942 "The acts of infringement referred to in the patent venue statute are those acts defined by the statute dealing with infringement." 60 Am. Jur. 2d Patents § 747 ; see, e.g. , Alco Standard Corp. v. Tennessee Valley Auth. , 448 F.Supp. 1175, 1182 (W.D. Tenn. 1978) ("[T]he meaning of 'acts of infringement' in [§] 1400(b) must be determined by reference to 35 U.S.C. [§] 271(a). Accordingly, an act within the scope of [Tennessee Valley Authority Act of 1933, § 19] protection cannot be deemed an 'act of infringement' under [§] 1400(b)."); Blackbird Techs. LLC v. Cloudflare, Inc. , No. 17-283, 2017 WL 4543783, at *3, 2017 U.S. Dist. LEXIS 167860, at *8-9 (D. Del. Oct. 11, 2017) ("What constitutes an act of infringement is determined by reference to the definition of patent infringement in 35 U.S.C. § 271(a), which states that patent infringement occurs whenever one 'without authority makes, uses or sells any patented invention within the United States during the term of the patent therefor.' "); Roche Products v. Bolar Pharm. Co. , 733 F.2d 858, 861 (Fed. Cir. 1984) ; 1 Moore's Federal Practice 0.144[9] at 1509-10 n.39. "[T]he 'acts of infringement' required to support venue [need not] be acts of direct infringement, and [ ] venue [may] lie if the defendant only induced infringement under 35 U.S.C.A. § 271(b) or contributed to infringement under 35 U.S.C.A. § 271(c)," and a contrarily "restricted view ... of venue is not sound." Gunter & Cooke, Inc. v. Southern Elec. Servs. Co. , 256 F.Supp. 639, 648 (M.D.N.C. 1966), aff'd , 378 F.2d 60 (4th Cir. 1967) ; Symbology Innovations, LLC v. Lego Sys., Inc. , 282 F.Supp.3d 916, 928 (E.D. Va. 2017) (citing Gunter ).[9] Where a complaint alleges infringement, the allegations "satisfy the 'acts of infringement' requirement of § 1400(b)" "[a]lthough the[ ] allegations may be contested." Symbology , 282 F.Supp.3d at 928.[10] "The issue of infringement is not *943 reached on the merits in considering venue requirements." In re Cordis Corp. , 769 F.2d 733, 737 (Fed. Cir. 1985) (citing Gunter ).
Google first appears to argue that direct infringement of a method claim by Google alone and entirely within this District is required to meet the requirement that it has allegedly committed an act of infringement under the venue statute. (Dkt. No. 125 at 18-19).[11] It is important to note that Google does not dispute that SEVEN alleges that Google practices at least one step of the allegedly infringing method, irrespective of whether that practiced method is infringing. (See generally id. ) However, Google argues that "SEVEN has failed to plead that Google performs each step of the method claim in this District, which is required to show that Google has committed an act of infringement in this District." (Id. at 18). Google relies on NTP, Inc. v. Research in Motion, Ltd. for this proposition. 418 F.3d 1282, 1317-18 (Fed. Cir. 2005) (ruling that "[i]t is well established that a patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized" and that a process "cannot be used within" a place "unless each of the steps is performed within" that place).
However, this exact argument has been previously rejected by the courts. "Contrary to Plaintiff's argument, not all of the alleged infringing activity needs to have occurred within [the District] so long as some act of infringement took place there." Blackbird Techs. , 2017 WL 4543783, at *4, 2017 U.S. Dist. LEXIS 167860, at *10 (specifically rejecting the Plaintiff's proposition (opposing a § 1404(a) motion) that while "some portion of the accused system is located in the Northern District of California, the data channels connecting the various network elements are found throughout the country," preventing "California [from being] the situs of infringement.").[12] As noted above, the acts of infringement required to support venue in a patent infringement action need not be acts of direct infringement, and venue does lie if the defendant only induced the infringement or contributed to the infringement in the forum. See Gunter , 256 F.Supp. at 648 ; see also Dover Corp. v. Fisher Governor Co. , 221 F.Supp. 716, 720 (S.D. Tex. 1963) ("I do not accept the defendant's theory of patent venue that 'acts of infringement' for venue purposes are exclusively defined as direct making, using or selling. The defendant's theory would virtually eliminate the availability of venue alternatives to a plaintiff suing a corporate 'contributory infringer,' for the suit would have to be brought at the place of the defendant's incorporation. I can discern neither the logic nor fairness of such a theory, for the place of incorporation of a 'contributory infringer' may be far removed from its principal place of business and from the place of occurrence of the acts or wrongs for which liability is imposed.").[13]
*944 The facts here comport with those of Blackbird, 2017 WL 4543783, 2017 U.S. Dist. LEXIS 167860. The court in Blackbird "reject[ed] the contention that acts of infringement were not done in California because the entire method allegedly was not practiced in the forum , the court noting that 'not all of the alleged infringing activity needs to have occurred within California so long as some act of infringement took place there,' and as the complaint alleged both method and apparatus claims, and ... finding that the accused infringers 'make or use the accused functionality' in the forum, and this was sufficient to show that § 1400(b) venue was proper in the transferee forum." 5 Annotated Patent Digest § 36:153.80 (discussing Blackbird Tech. , 2017 WL 4543783, 2017 U.S. Dist. LEXIS 167860 ) (emphasis added).[14] Google does not appear to dispute that SEVEN "explicitly alleged that at least one step of each of the claims is performed in this District." (Dkt. No. 141 at 27).[15] This is *945 sufficient to establish that acts of infringement were committed within this District for venue purposes under the patent venue statute.
Google also argues that merely alleging acts of infringement occurred in the District is insufficient under § 1400(b). Under Google's view, "the acts of infringement alleged in SEVEN's Complaint [must be] tied to or related to Google's purported regular and established place of business in this District," as "required" by 28 U.S.C. § 1400(b). (Dkt. No. 125 at 19) (emphasis added). The Court disagrees.
As this Court explained in Part II, courts applying the venue statute must hew closely to it. This duty constrains courts, forbidding minimizing or reading out requirements laid out by the statute; it similarly constrains courts from inserting or inventing requirements not present within the statute. Bates v. United States , 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."). As Raytheon Co. v. Cray, Inc. noted, the Federal Circuit has never addressed the question of whether the acts of infringement required by § 1400(b) must be related to the regular and established place of business of the defendant. 258 F.Supp.3d at 791-92. Google argues, however, that the language of § 1400(b), while written as setting proper venue in a judicial district "where the defendant has committed acts of infringement and has a regular and established place of business," actually only sets proper venue in a judicial district "where the defendant has committed acts of infringement at their regular and established place of business." The clear substitution of statutory language which Google's proposition requires demonstrates that it is incorrect. Additionally, the venue statute is "designed to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." Utterback v. Trustmark Nat'l Bank , 716 F. App'x. 241, 244 (5th Cir. 2017), cert. denied , --- U.S. ----, 138 S.Ct. 1699, 200 L.Ed.2d 954 (2018). It is not "unfair" to require a defendant to answer suit in a district wherein a defendant has a regular and established place of business and is alleged to have committed acts of infringement. Google would have the Court improperly read a requirement into the statute where none exists and ignore the facial independence of the statutory elements. The Court declines to do so.
While some courts have previously held that there must be some "reasonable or significant relationship between the accused item and any regular and established place of business of the accused in the judicial district," Scaramucci v. FMC Corp. , 258 F.Supp. 598, 602 (W.D. Okla. 1966),[16] many other courts reached the opposite conclusion, holding that "the regular and established place of business need not be the business connected with the alleged patent infringement." Ferguson v. Ford Motor Co. , 77 F.Supp. 425, 436 (S.D.N.Y. 1948). As one court explained:
Nothing in the language of Section 1400(b) justifies the conclusion that a defendant's place of business in the district must have some connection with the accused device. The statute requires only that the defendant have committed acts of infringement in the district and have a regular and established place of business there; there is no requirement that the two factors be related.
Am. Can Co. v. Crown Cork & Seal Co. , 433 F.Supp. 333, 336 (E.D. Wis. 1977) (quoting Bourns, Inc. v. Allen-Bradley Co. , 173 U.S.P.Q. 567, 568 (N.D. Ill. 1971) ); see also *946 Chadeloid Chem. Co. v. Chicago Wood Finishing Co. , 180 F. 770, 771 (C.C.S.D.N.Y. 1910) (Hand, J.) ("Even if they committed no act of infringement there, it would still be a place of business within the act, which clearly differentiates between the two."). The conjoined reading which Google advances improperly introduces a new requirement into the statutory text. Tesoro Hawaii Corp. v. United States , 405 F.3d 1339, 1347 (Fed. Cir. 2005) ("[I]t is the duty of the courts to enforce [the statute] according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision.") (citing Gibson v. United States , 194 U.S. 182, 192, 24 S.Ct. 613, 48 L.Ed. 926 (1904) ("Had Congress intended that such allowances as theretofore given should be continued, or to reserve, the right to commutation as to the sea ration, it would have been very easy to have inserted apt words which would have rendered effectual this purpose. But the terms of the law undertaking to revise former laws upon the subject make no such reservation as is contended for, and we think we are not at liberty to add to the statute by inserting it."), and United States v. Temple , 105 U.S. 97, 98, 26 L.Ed. 967 (1881) ("Our duty is to read the statute according to the natural and obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending its operation. When the language is plain, we have no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision.") (citations omitted) ).
While not controlling, the Fifth Circuit addressed this issue in Gaddis v. Calgon Corp. , 449 F.2d 1318 (5th Cir. 1971), concluding that it was error to "requir[e] a showing that the particular division [of the business] charged with the infringements [sic ] had a regular and established place of business present in the District." 449 F.2d at 1320 (emphasis omitted). The Fifth Circuit instead held that the totality of the circumstances together "add[ed] up to enough to establish venue," and rejected the same connection that Google now advances. Id. at 1320.[17]
This Court therefore rejects Google's proposition that the special patent venue statute requires that alleged acts of infringement by the Defendant pled to meet the requirements of § 1400(b) must be "tied to or related to" the regular and established place of business of the Defendant, which is separately required by § 1400(b). The Court finds that SEVEN has adequately pled acts of infringement within this District as to the claims related to the three objected-to patents-in-suit sufficient to meet the requirements of 28 U.S.C. § 1400(b).[18]
*947 B. Regular and Established Place of Business
This Court now turns to the issue of whether Google has a regular and established place of business within this District within the meaning of the patent venue statute, 28 U.S.C. § 1400(b). The Court believes adherence to the statutory requirements, informed by Federal Circuit guidance, is best demonstrated by addressing each of the requirements identified in In re Cray individually. 871 F.3d 1355. Proper venue lies in districts where each requirement of the venue statute is met. Only where one of the statutory requirements identified by the Circuit is not met is venue to be found improper.
i. Background[19]
Google is in the business of delivering information, including digital content such as movies, music, apps, and advertising. Google is a multinational technology company in the business of storing, organizing, and distributing data. More precisely, "Google is an information company." Its vision is "to provide access to the world's information in one click," and its mission is "to organize the world's information and make it universally accessible and useful." Making information available to people wherever they are and as quickly as possible is critical to Google's business. As Google's CEO, Sundar Pichai, explains, "We want to make sure that no matter who you are or where you are or how advanced the device you are using-Google works for you." To meet this goal, Google developed a content-delivery network that it calls the Edge Network.
Google delivers information through its Edge Network. Google provides web-based services, such as YouTube and Google Play, to users throughout the *948 world. These services are in high demand. Google reports that Google Play reaches more than 1 billion Android users and that YouTube serves over 1.5 billion users per month. Studies show that YouTube alone is responsible for approximately 20% of all internet traffic. Delivering that much data requires lots of bandwidth, and when the data is being transmitted to large numbers of geographically diverse users it must traverse multiple network paths at different times. It also costs money. The larger the data and the farther it has to travel, the greater the cost.
Google addresses these challenges with its Edge Network, which has three elements: Core Data Centers, Edge Points of Presence, and Edge Nodes. The Core Data Centers (there are eight in the United States) are used for computation and backend storage. Edge Points of Presence are the middle tier of the Edge Network and connect the Data Centers to the internet. Edge Nodes are the layer of the network closest to users. Popular content, including YouTube videos, video advertising, music, mobile apps, and other digital content from the Google Play store, is cached on the Edge Nodes, which Google refers to as Google Global Cache (GGC).
Google Global Cache is recognized as "one of Google's most important pieces of infrastructure," and Google uses it to conduct the business of providing access to the world's information. GGC servers in the Edge Nodes function as local data warehouses, much like a shoe manufacturer might have warehouses around the country.[20 ] Instead of requiring people to obtain information from distant Core Data Centers, which would introduce delay, Google stores information in the local GGC servers to provide quick access to the data.
"Caching and localization are vital for [Google's] optimization of network resources." Because "hosting all content everywhere is inefficient, it makes sense to cache popular content and serve it locally." Doing so brings delivery costs down for Google, network operators, and internet service providers. Storing content locally also allows it to be delivered more quickly, which improves user experience: "Serving content from the edge of the network closer to the user improves performance [and] user happiness." To achieve these benefits, Google has placed Edge Nodes throughout the United States, including in this District. Google describes these nodes as the "workhorse[s] of video delivery."
Just like brick-and-mortar stores, Google's GGC servers independently determine what content to cache based on local requests.[21 ] The GGC servers in Google's Edge Nodes include software that Google refers to as "Ustreamer (actually μstreamer, i.e. micro-streamer)." Ustreamer is "responsible for serving video content from YouTube and other Google services, along with other large content such as Google Play applications and Chrome downloads." It operates on a content-delivery platform "at the edge of Google's network" called "bandaid"; it "does not run in the core (except for some internal testing purposes), unlike the majority of the Google services, such as search or gmail."
Using ustreamer and bandaid, a GGC server "handles requests directly from its clients, predominantly YouTube's video *949 players." When such a request is received, if the content is stored in the node's local cache, "the node will serve [it] ... to the end user, improving the user experience and saving bandwidth." If cache-eligible content is not already stored on the node, and the content is cache-eligible, "the node will retrieve it from Google, serve it to the user, and store it for future requests."
Ustreamer is largely "autonomous," "in the sense that almost all decisions related to serving a particular request are made locally, without coordinating with other servers." Like a brick-and-mortar store sells directly to customers from inventory and stocks that inventory based on local customer demand, ustreamer in each GGC node decides-independently from other nodes in Google's Edge Network- whether to serve requested content, whether to cache content, and whether to send requests to other servers.[22 ]
Google's GGC servers are housed in spaces in the District leased by Google.[23 ] Google's GGC servers are housed in spaces leased[24 ] by Google from Internet Service Providers (ISPs) whose networks "have substantial traffic to Google and are interested in saving [bandwidth]." Hosting Google servers allows ISPs to save both bandwidth and costs, as they "do not incur the expense of carrying ... traffic across their peering and/or transit links."
When an ISP agrees to host a GGC server, the parties enter into a Global Cache Service Agreement, under which Google provides hardware and software- including GGC servers and software-to be housed in the host's facilities; technical support; service management of the hardware and software; and content distribution services, including content caching and video streaming. In exchange, the host provides, among other things, a physical building, rack space where Google's computer hardware is mounted, power, and network interfaces. "All ownership rights, title, and intellectual property rights in and to the Equipment [i.e., the hardware and software provided by Google] ... remain in Google and/or its licensors."
Google GGC servers located in this District cache Google's products and deliver them to residents of this District. Google does not dispute the following.
1. Multiple ISPs hosted GGC servers in the Eastern District of Texas for at least the five months leading up to the filing of the lawsuit (and they continue to do so).
2. Suddenlink Communications, for example, is an ISP that hosts six GGC servers in Tyler, Texas.
3. CableOne is an ISP that hosts three GGC servers in Sherman, Texas, and three GGC servers Texarkana, Texas.
*950 4. Google caches content on its GGC servers located in the Eastern District of Texas.
5. Google's GGC servers located in the Eastern District of Texas cache content that includes, among other things: (i) video advertising; (ii) apps; and (iii) digital content from the Google Play store.
6. Google's GGC servers located in the Eastern District of Texas deliver cached content referenced in number 5, above, to users in the Eastern District of Texas.
7. Google generates revenue (i) by delivering video advertising, (ii) from apps, and (iii) from digital content in the Google Play store.
8. Google treats its GGC servers in the Eastern District of Texas the same as it treats all of its other GGC servers in the United States.
The photographs below show Google's GGC servers hosted by Suddenlink and the building where they are located at 322 North Glenwood Boulevard, Tyler, Texas 75702.
ii. Physical Place
Google argues that "GGC servers are not 'physical places of business.' " (Dkt. No. 125 at 9). "A server is a piece of hardware or equipment, not a place. SEVEN itself has described the servers as 'physical objects housed at physical locations' (Dkt. [No.] 76 at 14), which is exactly right. The servers are objects; the locations where they are stored are the places." (Id. ) "Contrary to SEVEN's allegation that 'a physical, geographical location' can be broader than a building or quarter (Opp. 12), all three 'locations' identified in Cray were buildings or quarters: employees' home offices, distribution centers, and a building occupied by the secretarial service." (Dkt. No. 148 at 2). "Even people (employees) are physical objects that enclose space, which alone cannot establish venue. SEVEN's definition directly contradicts Section 1400(b) and Cray , both of which require a 'place' to establish venue, not objects or physical things." (Id. )
Google relies on a sister court's ruling from this District considering these GGC servers to support its contention. "The GGC servers are not 'places' under the meaning of the statute and therefore cannot establish a regular and established place of business in this [D]istrict." Personal Audio, LLC v. Google, Inc. , 280 F.Supp.3d 922, 934 (E.D. Tex. 2017).
With respect to its sister court, this Court disagrees with that conclusion. A revisiting of the ultimate decision of Personal Audio on this issue is not only possible but compelled by the facts of this case. Additionally, in this Court's opinion, neither the statute nor the Federal Circuit's guidance in In re Cray permit the result reached by that court.[25]
Specifically, the Court recalls the conclusion it noted supra n.3.
*951 Section 1400(b) of Title 28, United States Code lays proper venue where "the defendant ... has a regular and established place of business." As the Federal Circuit instructed in In re Cray , "[t]he statute [ ] cannot be read to refer merely to a virtual space or to electronic communications from one person to another." 871 F.3d at 1362 (emphasis added). Any reading of the statute which "authorizes" such places must be rejected. Id. However, the Federal Circuit's inclusion of "merely" indicates that while a virtual space or electronic communications alone are insufficient to denote a "place" within the meaning of the statute, they may, with more, be indicative of the requirement having been met. This is precisely the situation here.
Of course, it would run counter to the statutory requirements to find proper venue in a district where there was no physical presence of a given defendant. A defendant who does not establish or permit a physical presence within a district of its own volition may not be brought into a district pursuant to the venue statute by the acts of another. To hold otherwise contravenes the language of the statute, requiring the defendant to "[have] a regular and established place of business" within the district. 28 U.S.C. § 1400(b).[26] This is true even where there may be citizens of that district who, at their places (homes, for example) connect to that defendant's website and engage that defendant in business or where a defendant's employees have their own places in which they perform their employment. In re Cray , 871 F.3d at 1363 ("[I]t must be a place of the defendant, not solely a place of the defendant's employee.") (emphasis omitted).
Here, however, there is more than "merely" "a virtual space or [ ] electronic communications from one person to another." Id. at 1362. The "place" is specifically localized: a physical server occupying a physical space. Not only does Google exercise exclusive control exercised over the digital aspects of the GGC ,[27] Google exercises exclusive control over the physical server and the physical space within which the server is located and maintained.
In this regard, the Court has considered the Beta Service Agreement: Google Global Cache (GGC) Service between Google and Suddenlink ("the Suddenlink Agreement") (Dkt. No. 141-23).[28] It reveals that Google exacts far more control than may *952 be suspected from a general lease arrangement. Google requires ISPs such as Suddenlink to provide "[r]ack space, power, network interfaces, and IP addresses, as specified in the following table [omitted], in consultation with Google";[29] "[r]emote assistance and installation services described in SCHEDULE 'A' "; "[n]etwork access between the Equipment and Host network subscribers"; and "[r]emote high bandwidth access, sufficient for Google to download upgrade images of GGC to the Equipment, unless separate arrangements are agreed with Google." (Dkt. No. 141-23 at 1). The Suddenlink Agreement makes it clear that the ISP does not own the server(s); Google owns the servers. (Dkt. No. 141-23 at 2 (In the event of termination of the Agreement: "Host will remove, package and ship (shipping charges will be pre-paid directly by Google to the carrier, and Host will undertake such removal and packaging to be undertaken in a commercially reasonable manner) all Equipment back to Google within fifteen (15) calendar days of effective date of termination. If Host fails to do so, Google will have the right to: (a) charge Host and Host will pay the fair market value of the Equipment; or (b) recover and take possession of such Equipment , and for this purpose may enter any premises of Host where such equipment is located during normal working hours to remove Equipment. Host will promptly surrender the Equipment to Google in as good order and condition as originally delivered, reasonable wear and tear excepted.") (emphasis added) ). Google is not even required to replace faulty servers under the Suddenlink Agreement. (Dkt. No. 141-23 at 7 ("Google Services: Google will provide the following services in beta: ... 3. replace faulty Equipment (at Google's cost and sole discretion)") ). This Agreement is not a mere lease of digital space or computing power; it is the installation of Google's own servers in a physical space that becomes Google's. Following installation of the GGC server, the ISP is required to provide Google explicit details regarding Google's server's installation location. (Id. at 3 ("Contact & Location Details: As soon as practicable after the Effective Date, the parties will advise each other in writing (which may be sent electronically) of the following: ... (c) Equipment location (address/floor/rack)") ). Once installed, it is considered a permanent fixture. There is no dispute that the Suddenlink Agreement requires that, in order for an ISP to move a previously installed GGC from one location to a new location, it must secure Google's permission, which Google may not permit "at its sole discretion." (Dkt. No. 141-23 at 2 ("Change Notification: Host will provide Google no less than thirty (30) days' written notice of any proposed relocation of the Equipment or change of IP address. Host may propose relocation at any time. Google, at its sole discretion, may elect not to accept the proposed relocation but will reasonably consider any such relocation and discuss all reasonable options with Host.") (emphasis added) ). Google's ownership of the server and its contents is absolute, as is Google's control over the server's location once it is installed. (Dkt. No. 141-24 at 2 ("Restriction on Use of Equipment: All ownership rights, *953 title, and intellectual property rights in and to the Equipment shall remain in Google and/or its licensors. THE EQUIPMENT OR ANY PORTION THEREOF MAY NOT BE USED, COPIED, TRANSFERRED, REVERSE-ENGINEERED, OR MODIFIED EXCEPT AS EXPRESSLY PERMITTED BY THIS AGREEMENT. Host must not, without the prior written consent of Google (which may be withheld in its sole discretion), access, use, or dispose of the Equipment, in whole or in part.") (emphasis added) ).
This is not a partnership, wherein an ISP may independently act on Google's behalf in administering the GGC. To the contrary, the Suddenlink Agreement expressly disclaims any such relationship. (Dkt. No. 141-24 at 2 ("No Partnership, No Exclusivity: The parties are independent contractors, and this Agreement does not create an agency, partnership or joint venture. This Agreement is not intended to, nor does it create, any agency, partnership, joint venture or other profit-sharing arrangement, nor does it create an exclusive relationship between the parties. This Agreement places no restrictions of any type on either party's ability to freely compete or to enter into agreements with other entities or individuals.") ). Indeed, Google's total control over the GGC server's physical presence within the ISP may be best illustrated by the Suddenlink Agreement's requirement that tasks such as the "physical switching of a toggle switch;" "power cycling equipment (turning power on and/or off);" and "tightening screws , cable ties, or securing cabling to mechanical connections, plug;" may be performed "only with specific and direct step-by-step instructions from Google." (Dkt. No. 141-23 at 6) (emphasis added).
This level of control in the physical world exemplifies how the physical presence of the GGC server within this District constitutes more than "merely" "a virtual space or [ ] electronic communications from one person to another." In re Cray , 871 F.3d at 1362. Indeed, such control in the physical realm over a specific physical space establishes that, irrespective of the determinations related to the other § 1400(b) requirements, there is a physical place which this Court may examine to determine if it is a regular and established place of business and whether it is a place of the defendant.[30]
*954 Accordingly, the Court finds that, in this case, the GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a "physical place."[31] SEVEN has met its burden to demonstrate satisfaction of this statutory requirement.
iii. Regular and Established Place of Business
Google argues that "[e]ven if the GGC servers were 'places' ... SEVEN fails to provide a basis to conclude that these servers are 'places of businesses,' let alone regular and established places of business of Google." (Dkt. No. 125 at 10). The Court will address the "of Google" argument in Part III.B.iv., infra , but as to whether the GGC servers and the place where the servers are lawfully housed are "places of business" within the meaning of the statute, the Court reaches the opposite conclusion--they undoubtedly are.
Google's shotgun arguments point in many directions, each intended to persuade that the GGC servers are not places of business within the meaning of the statute: "[t]he GGC servers are standard machines manufactured by a third-party and used to cache static Google content"; "[s]ervers are pieces of equipment, like slot machines or vending machines, and do not rise to the level of being places of business"; "there would be little to no impact to the performance of Google's Edge Network or to Google users if there were no GGC servers in this District," as the "GGC servers in this District are 'a fraction of a fraction' of 1 percent of the total serving capacity of Google's peering and GGC server network." These arguments must be rejected.
In arguing that slot and vending machines are not places of business, Google cites HomeBingo Network, Inc. v. Chayevsky , 428 F.Supp.2d 1232, 1250 (S.D. Ala. 2006) ("That an individual may be a part owner of a piece of equipment (in this case, a slot machine) located in a judicial district does not render the situs of that equipment his regular and established place of business for venue purposes."), and Magee v. Coca-Cola Refreshments USA, Inc. , 833 F.3d 530, 534 (5th Cir. 2016) (finding that "vending machines are not 'sales establishments,' " where "establishment" was "a place of business or residence with its furnishings and staff."). However, these citations do not support Google's proposition.
First, the Court notes that HomeBingo relates to specifically named individual (natural person) defendants named in suit in conjunction with a corporate entity. HomeBingo , 428 F.Supp.2d at 1235-36. The specific proposition rejected by the HomeBingo Court was that "(i) [the individual corporate officers] Macke, Minard and Chayevsky own, operate, and maintain [the corporate defendant] Cadillac Jack's bingo-based slot machines; (ii) a number of those machines are located at the Atmore casino; and (iii) therefore, Movants have a regular and established place of business in the Southern District of Alabama." Id. at 1250. That the proper venue of the corporate defendant, Cadillac Jack's, was properly based upon the presence of the bingo-based slot machines in the Southern *955 District of Alabama was far from being rejected by the HomeBingo court--it was not even challenged by the defendant in that case. Thus, HomeBingo stands for the proposition that Google's GGC server may not establish that Sundar Pichai (Google LLC's CEO) has a regular and established place of business within this District. Id. at 1251 ("As such, the Court finds that the Cadillac Jack slot machines located at a casino in Atmore, Alabama do not constitute a regular and established place of business for Macke, Minard and Chayevsky, as individuals."). It does nothing to demonstrate that the GGC server should not be considered a regular and established place of business as to Google.
As to Magee , the Court first notes that the Fifth Circuit was not considering whether a vending machine was a regular and established place of business but, rather, a "sales establishment" under the ADA such that it constituted a place of "public accommodation" subject to Title III compliance. 833 F.3d at 532. This is not a beneficial comparison. Further, there are opinions by numerous courts squarely holding that vending machines or similar objects are places of business.[32] All of this *956 aside, it is not the machine alone (be it a server, slot machine, or vending machine) that moves the Court to its ultimate conclusion in this case. It is the server, its physical location within this District, the control exerted over both the server and its location under the GGC agreements (like the Suddenlink Agreement), and the other circumstances here present that lead this Court to conclude these facts meet the strict statutory application laid out by the Federal Circuit in In re Cray.
Google's argument relating to the impact of the GGC servers in this District on its Edge Network or on Google users is similarly rejected. The statute does not require "substantial" business or "large" impact from the business being done at the place of business--in order to lay proper venue in a judicial district, the statute simply requires that a regular and established place of business be present. The Court refuses to read into the statute extra-statutory requirements at the behest of Defendants who have, through their own volition, secured and established multiple places of business within this District.
Google argues that it does not need the GGC servers in this District, and that their contribution to Google's business mission is so small as to be immaterial. However, even the Personal Audio court explicitly found that GGC servers may be found in "at least Tyler, Sherman, Plano, and Texarkana," that "[t]he GGC servers carry out a useful role in Google's business, in that they appear to more efficiently connect internet service customers, i.e., customers of Suddenlink or CableOne, to Google content," and that "Google evidently values the contribution of the GGC system." Personal Audio , 280 F.Supp.3d at 934 (citations omitted). That the machines are manufactured by third parties is of no moment as places of business are frequently manufactured by third parties. Indeed providing business services, such as office space, logistics, telecommunications, retail and commercial locations, and customer facing automated points-of-sale,[33] to businesses is not only common but is a business model unto itself. These servers actively service a distinct business need of Google's, as described in the Background section, supra at 947-48. Thus, they are places of business.
Further, the Court has previously seen this "impact" argument in a similar context; it reveals how such a reading of the statute undermines the clear statutory scheme. See, e.g. , Word to Info, Inc. v. Apple Inc. , 2:17-cv-592-JRG, Apple's Motion to Dismiss for Improper Venue (Redacted Version), Dkt. No. 23 at 4-5[34] (arguing that "Apple's stores do not constitute a regular and established place of business for venue purposes because they account for only a trivial part of Apple's overall business.... Apple's two retail *957 stores are not a substantial part of its ordinary business. Apple has approximately 270 retail stores in the United States. The two stores in this district account for less than 1% of Apple's total retail establishments .... Likewise, the two stores in this district account for only small part of Apple's sales. Because the two stores in the Eastern District represent such a small part of Apple's overall operations, if Apple closed those stores, its established business ... would not be appreciably or substantially affected."), at 5 ("Subjecting a company with 80,000 employees and 270 stores across the United States to venue in the Eastern District because of the presence of two retail outlets accounting for only [redacted] of Apple's revenues would allow the tail to wag the dog, especially when those stores do not represent the totality of Apple's business operations."). Examining the "effect" on a company's business which a particular place or places of business have is not in keeping with a strict statutory application. In fact, it undermines it. Reading a non-statutory requirement that the place of business for § 1400(b) requires the place of business to be a substantial part of a defendant's ordinary business or have a material effect on a business's provisioning of goods or services does violence to the language of the statute and is precisely the kind of statutory deviation the Federal Circuit cautioned against in In re Cray, 871 F.3d at 1362 ("We stress that the analysis must be closely tied to the language of the statute."), 1364, 1364 n. 1 (noting that any "relative comparison" of "the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues" should not include "value judgments on the different types of business activity conducted therein.") (emphasis omitted).
Google additionally argues that "the servers are also not 'regular and established' because under the agreements between Google and the ISPs, either party can terminate at any time and for any reason." (Dkt. No. 125 at 11 (citing the Suddenlink Agreement) ). The Court disagrees. A business which has a five-year agreement is certainly no less established with a month remaining on the lease than it is in the first year of the lease. A month-to-month agreement which has endured for years is clearly "regular and established." There is little question that Google intends the GGC servers to be a "[s]calable long term solution for edge content distribution," and it is undisputed that they have been such a solution in this District for years. (Dkt. No. 141-18 (Mike Axelrod, The Value of Content Distribution Networks and Google Global Cache) at 10; Dkt. No. 141 at 19). The fact that the Suddenlink Agreement may be terminated is not evidence that Google's presence in this District is somehow less than "regular and established." Few sophisticated transactional documents fail to have one or more escape clauses, but nothing about such provisions makes the commercial targets addressed less than established.
As a part of ensuring a proper application of the statutory language, it may be appropriate to consider similar types of places of business to demonstrate the appropriateness of this Court's finding. SEVEN argues that "GGC servers in the Edge Nodes function as local data warehouses, much like a shoe manufacturer might have warehouses around the country. Instead of requiring people to obtain information from distant Core Data Centers, which would introduce delay, Google stores information in the local GGC servers to provide quick access to the data." (Dkt. No. 141 at 4). "The only relevant difference between a warehouse that stores a company's tangible products and *958 Google's GGC servers is the nature of the products being stored-physical merchandise versus digital content. Regardless of what the products may be, if the physical structure that stores them is 'a physical, geographical location in the district from which the business of the defendant is carried out,' that structure is a place of business under § 1400(b)." (Id. at 15 (citing In re Cray , 871 F.3d at 1362 ) ). The Court agrees.
There is no question that warehouses are properly considered places of business and have been so held, by both legislatures and courts.[35] ,[36] ,[37] This recognition makes *960 intuitive sense. The vast majority of business organizations require and utilize some form of storage or logistics. Of course, businesses may store items at other business's locations (like, for example, Fulfillment by Amazon[38] ) wherein goods are stored by third parties at the third parties' discretion and with no control over the location, management, or daily supervision of the products in storage. Such an arrangement can scarcely be considered to render the physical location of the stored items a place of business as to the party whose goods are stored. However, were that same party to integrate the storage arrangement into its own logistical operations (similar to, for example, Amazon and its relationship with its own fulfillment centers), there can be little doubt that the storage warehouses are places of business, even if the public never interacts with the warehouse. See Smith v. Farbenfabriken of Elberfeld Co. , 203 F. 476, 479-81 (6th Cir. 1913).[39]
Here, the GGC servers are best characterized as local data warehouses, storing information in local districts to provide Google's users with quick access to the cached data, avoiding the delays associated with distant data retrieval from Google Data Centers. (Dkt. No. 141 at 4). This *961 type of logistical positioning is commonplace for larger corporate interests, especially where prompt delivery is a core aspect of a business strategy.[40] ,[41] This is the case with Google.[42] Holding that Google's business done at and through the GGC servers faithfully comports with the language of the statute; it is the logical result this Court has reached.[43]
In considering the language of the patent venue statute, some courts have held that § 1400(b)"requires some employee or agent of the defendant to be conducting business at the location in question."
*962 Peerless Network, Inc. v. Blitz Telecom Consulting, LLC , No. 17-CV-1725 (JPO), 2018 WL 1478047, at *4 (S.D.N.Y. Mar. 26, 2018).[44] These cases reason that this must be so since, to be a place of business, "the defendant must actually engage in business from that location," such that, "for example, products are made, customers are served, or business decisions are made." Id. However, this requirement finds no basis within the language of the statute, nor does it accord with conceptions of places of business stretching back to at least the turn of the 20th century. See, e.g. , supra at 958 n.35, 959 n.36. The mandates of In re Cray requiring that a court's "analysis must be closely tied to the language of the statute" prevents both the removal of statutory requirements and the addition of extra-statutory requirements with equal force. 871 F.3d at 1362 ; see also Fed. Elec. Prods. Co. v. Frank Adam Elec. Co. , 100 F.Supp. 8, 10-11 (S.D.N.Y. 1951) ("Lengthy precedent is available to show that courts have been unwilling to constrict the definition of 'regular and established place of business.' "); Urquhart v. American-La France Foamite Corp. , 144 F.2d 542, 543 n.3 (D.C. Cir. 1944), cert. denied 323 U.S. 783, 65 S.Ct. 273, 89 L.Ed. 625 (1944) ("Nor should the term 'a regular and established place of business' be narrowed or limited in its construction.") (citing Shelton v. Schwartz , 131 F.2d 805, 808 (7th Cir. 1942) ); Shelton , 131 F.2d at 809 ("Emphasis must be on the existence of the regular and established place of business,-not on the nature or character of the business conducted there.").
Any such addition or subtraction from the language of the statute is improper and contrary to the express prohibition as set forth in In re Cray. "[T]he requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interests of some overriding policy, is to be given a liberal construction." In re ZTE , 890 F.3d at 1014 (citing In re Cray , 871 F.3d at 1361 ). The narrowing would do violence to the plain language of the statute, as § 1400(b) does not require that the place of business also be a place of employment by the defendant.[45]
Recent legislation also reveals the impropriety of the imposition of an extra-statutory human-centric requirement. The Leahy-Smith America Invents Act, P.L. 112-29, ("the AIA") was enacted September 16, 2011. It is widely considered to be "a change at least as significant for this Nation's patent system as the formation of the Federal Circuit in 1982." Synopsys, Inc. v. Mentor Graphics Corp. , 814 F.3d 1309, 1324 (Fed. Cir. 2016) (Newman, J., dissenting), overruled by Aqua Prod., Inc. v. Matal , 872 F.3d 1290 (Fed. Cir. 2017). The AIA "is the product of extensive study by the concerned communities and the Congress," and the breadth of its reach in reforming facets of patent law, both substantive and procedural, is unquestionably vast. Id. at 1325. Of note, Congress enacted, but did not codify, Section 18 of the *963 AIA, which established a "Transitional Program for Covered Business Method Patents." P.L. 112-29, Sec. 18. This Section set up an additional post-grant proceeding, Covered Business Method Review, in addition to the two codified options created by the AIA, Post-Grant Review and Inter Partes Review. Of special interest to applications of § 1400(b), the Section reached beyond the confines of the newly enacted law to specifically exempt a particular regular and established place of business for purposes of venue under § 1400(b). Section 18(c) reads as follows:
ATM EXEMPTION FOR VENUE PURPOSES.--In an action for infringement under Section 281 of title 35, United States Code, of a covered business method patent, an automated teller machine shall not be deemed to be a regular and established place of business for purposes of section 1400(b) of title 28, United States Code.
Accordingly, Congress specifically withdrew automated teller machines ("ATMs") from those regular and established places of business which could be used to establish venue.[46] A plain reading of this exception indicates that ATMs and similar devices would otherwise constitute regular and established places of business. See also Edward D. Manzo, America Invents Act: A Guide to Patent Litigation and Patent Procedure, Venue, America Invents Act § 17:12 (2017).[47]
"Courts assume that a legislature always has in mind previous statutes relating to the same subject when it enacts a new provision. In the absence of any express repeal or amendment, the new provision is presumed to accord with the legislative policy embodied in those prior statutes, and they all should be construed together." 2B Sutherland Statutory Construction § 51:2 (7th ed.) ; accord A. Scalia & B. Garner, READING LAW 252 (2012) ("Any word or phrase that comes before the Court for interpretation .... is part of an entire juris corpus. So, if possible, it should no more be interpreted to clash with the rest of that corpus than it should be interpreted to clash with other provisions of the same law."); Goodyear Atomic Corp. v. Miller , 486 U.S. 174, 184-85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). "Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes." Felix Frankfurter, Some Reflections on the Reading of Statutes , 47 COLUM. L. REV . 527, 539 (1947). "It is well established *964 in the statutory field that unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense." Texaco, Inc. v. Dep't of Energy , 795 F.2d 1021, 1030 (Temp. Emer. Ct. App. 1986) (citation and internal quotations omitted).[48]
Automated Teller Machines are not operated, in person or remotely, by employees of the owning financial institution.[49] Any reading of the statutory requirements of § 1400(b) that inserts an extra-statutory requirement of human-centric activity at the "regular and established place of business" necessarily renders this express exemption superfluous. A. Scalia & B. Garner, READING LAW 174 (2012) ("The surplusage canon holds that it is no more the court's function to revise by subtraction than by addition."). A "cardinal principle of statutory interpretation" is that no provision "shall be superfluous, void, or insignificant." TRW Inc. v. Andrews , 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ; Gustafson v. Alloyd Co. , 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."); Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana , 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (applying the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (citation omitted). Where "one statute deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible." 2B Sutherland Statutory Construction § 51:5 (7th ed.). A. Scalia & B. Garner, READING LAW 181 (2012) ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."). Where two acts are in pari materia , as here, they should be construed together. But even if one reads the ATM exemption of AIA Sec. 18(c) as being in conflict with the generally application of the special venue statute, "the general statute must yield to the specific statute involving the same subject, regardless of whether it was passed prior to the general statute." 2B Sutherland Statutory Construction § 51:5 (7th ed.) ; Morton v. Mancari , 417 U.S. 535, 550-51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (Blackmun, J.) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.") (citing Bulova Watch Co. v. United States , 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961) ; Rodgers v. United States , 185 U.S. 83, 87- 89, 22 S.Ct. 582, 46 L.Ed. 816 (1902) ). Accordingly, the Court holds that the "regular and established place of business" requirement of § 1400(b) does not countenance the addition of a further human-centric requirement at the place of business.
Having so held, the Court finds that, for the reasons discussed above, the GGC servers and their several locations within this District constitute "regular and established place[s] of business" within the meaning of the special patent venue statute.
*965 iv. Of the Defendant
The last of the three statutory requirements identified by the Federal Circuit in In re Cray is that the regular and established place of business be "of the defendant." 871 F.3d at 1362-63. Other courts have previously found "shelves" which store telecommunications equipment are "places of the defendant." Peerless Network , 2018 WL 1478047, at *3 ("[A]ssuming that Local Access rents the shelf on which its equipment rests, the Court is satisfied that the shelf is 'a place of the defendant,' even if the shelf is figuratively land-locked inside of Peerless territory. The fact that Local Access employees must gain Peerless's permission to visit their shelf does not change the fact that, as alleged, the shelf belongs to Local Access.") (internal citations omitted). This case presents a similar situation[50] and thus reaches a similar result.
Google argues that "the rooms and buildings that house the GGC servers in this District ... are not Google's." (Dkt. No. 125). The Court recognizes that they may not, on their own, establish proper venue as to Google in this District. See Personal Audio , 280 F.Supp.3d at 934 ("The property on which they are located is not owned, leased, or controlled by Google. The 'server rooms' are not rooms from which the business of Google is conducted.").
However, as discussed above, supra Part III.B.ii., the "place" of the "place of business" is not the room or building of the ISP but rather Google's server and the space wherein it is located. There is little doubt that both the server and the physical location in and at which it resides is under the exclusive control of Google. The rack space allotted for the GGC server is "provided" to Google. (Dkt. No. 141-23 at 6 ("Space: The Host shall provide Google rack space for the Equipment located at the Space within Host premises.") ). The precise location of that space, and thus the server, is reported to Google by the ISP. (Dkt. No. 141-23 at 3 ("Contact & Location Details: As soon as practicable after the Effective Date, the parties will advise each other in writing (which may be sent electronically) of the following: ... (c) Equipment location (address/floor/rack)") ). Further, as noted supra at 952-53, "Google's ownership of the server and its contents is absolute, as is its control over the server's location, once installed." (See Dkt. No. 141-23 at 6). Google's ownership of the server and control thereof has not been a focus of Google's objections to proper venue in this District. Supra at 953 n. 30.
Google itself has denoted that the GGC servers are places "of Google." As the Federal Circuit instructed in In re Cray , "a defendant's representations that it has a place of business in the district are relevant." 871 F.3d at 1363. In this respect, "[p]otentially relevant inquiries include whether the defendant lists the alleged place of business on a website," in determining whether "the defendant [has] establish[ed] or ratif[ied] the place of business," within the meaning of the statute. Id. Here, Google has done so. Google states on http://peering.google.com that "Our Edge Network is how we connect with ISPs to get traffic to and from users"
*966 and that this content traffic "can come from multiple Google locations, including our data centers Edge PoPs, and Edge Nodes. " (Dkt. No. 197-1 at 1).[51]
The Court concludes that the GGC servers and their locations within the various ISPs within this District are "places of Google" sufficient to meet the statutory requirement of § 1400(b).
VI. CONCLUSION
In light of the foregoing, the Court finds and holds that:
1) SEVEN has adequately pleaded acts of infringement within this District sufficient to meet the requirements of 28 U.S.C. § 1400(b). Supra at 946.
2) SEVEN has met its burden of demonstrating that the GGC server and its location is a "physical place" within the meaning of § 1400(b). Supra at 953.
3) SEVEN has met its burden of demonstrating that the GGC server and its location is a "regular and established *967 place of business" within the meaning of § 1400(b).[52] Supra at 964-65.
4) SEVEN has met its burden of demonstrating that the GGC server and its location is a "place of the defendant" within the meaning of § 1400(b). Supra at 965-66.
Having so found, the Court holds that the statutory requirements of § 1400(b) are met in this case and that venue is proper as to Google within this District.[53] Accordingly, the Court hereby DENIES Google LLC's Second Renewed Motion to Dismiss or, in the Alternative, Transfer under 28 U.S.C. § 1406 for Improper Venue. (Dkt. No. 125).
It is further ORDERED that this ruling will remain PROVISIONALLY SEALED until the Parties file joint proposed redactions, with specific explanations for the necessity of such redactions, within seven (7) days of this order, after which a redacted version will be entered by the Court.
So ORDERED and SIGNED this 19th day of July, 2018.

Accord In re BigCommerce , 890 F.3d at 985 ("The requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction .... We cannot ignore the requirements of the statute merely because different requirements may be more suitable for a more modern business environment.") (quoting Schnell v. Peter Eckrich & Sons, Inc. , 365 U.S. 260, 264, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961) ).

Describing In re Cray as setting forth a precise test of any kind likely reads too much into the actions of the Federal Circuit. As noted supra , the Circuit specifically held that the "requirements" it provided "inform ... but do not supplant the statutory language." Id. at 1362. Accordingly, In re Cray is properly viewed as a set of guidelines. Thus, a district court may rely on In re Cray but must be mindful that its first master when determining proper venue is the statute itself.

The Federal Circuit's inclusion of "merely" indicates that a virtual space or electronic communications alone is insufficient to denote a "place" within the meaning of the statute. However, the statement also indicates that both a virtual space and electronic communications may be indicative of the requirement having been met where additional facts are present.

The Court turns to the dictionaries considered by the Federal Circuit--The Century Dictionary further supports the Circuit's rejection of purely virtual locales from the statute. Place , The Century Dictionary , 4520 (Benjamin E. Smith, ed. 1911) ("7. Room to abide in; abode; lodgment; location."); id. ("8. Room to stand or sit in; a particular location, as a seat, or a space for sitting or standing, as in a coach, car, or public hall."); id. ("9. A particular locality ...."). Black's similarly accords. Place , Black's Law Dictionary (1st ed. 1891) ("This word is a very indefinite term. It is applied to any locality, limited by boundaries, however large or however small. It may be used to designate a country, state, county, town, or a very small portion of a town. The extent of the locality designated by it must be determined by the connection in which it is used. 46 Vt. 432.").

The Court has surveyed additional dictionaries of the time specified, both legal and general, to ensure proper application of the statutory scope. Joseph Worchester, Dictionary of the English Language , 1083 (1860) (Place: "1. A particular portion of space; a locality; station; situation; position; post; site; spot."); Webster's High School Dictionary , 317 (1892) (Place: "Portion of space; position; locality."); Stormonth, Etymological and Pronouncing Dictionary of the English Language , 748 (7th ed. rev., 1882) (Place: "situation, site, or spot."); Universal Dictionary of the English Language , 5628-29 (Hunter et al. eds., 1897) (Place (ordinary language): "2. A particular portion of space, considered as separate and distinct from the rest of space; a particular locality, spot, or site; position.") (citing Milton: P. L. , i. 253); Robert Gordon Latham, A Dictionary of the English Language (1882) (Place: "1. Particular portion of space. 2. Locality; ubiety; local relation. 3. Local existence."); J. Kendrick Kinney, A Law Dictionary and Glossary , 525 (1893) (Place: "any locality limited by boundaries, whether large or small."); William C. Anderson, A Dictionary of Law , 774 (1889) (Place: "Any locality limited by boundaries, however large or small .... The extent of the locality is to be determined by the connection in which the word is used;" "In internal revenue acts, as applied to the place where a licensee may carry on business, construed with reference to the business .... In a statute forbidding betting in any 'house, office, room, or other place,' need not be covered with a roof; an umbrella is such place."); Benj. V. Abbott, Dictionary of Terms and Phrases , 280 (1879) (Place: "The word place has a very wide and varied signification, so that its precise meaning can only be determined by the connection in which it is used, and by having regard to the apparent purpose of the writer."); Benjamin W. Pope, Legal Definitions , 1179 (1920) (Place: "A 'place' is any space separated and distinguished from all other space."); Bouvier's Law Dictionary , 2595 (1914) (Place: "The word is associated with objects which are, in their nature, fixed and territorial;" "Any piece of ground appropriated by its owner or occupier for the time being is a place within the English betting houses act but the ground must be so appropriated and must be an ascertained place.") (citations omitted); see also Bouvier's Law Dictionary , 415 (1883) (Place of Business: "The place where a man usually transacts his affairs or business."); Place of Business , Black's Law Dictionary (5th ed. 1979) ("The location at which one carries on his business or employment."); Walter A. Shumaker and George Foster Longsdorf, The Cyclopedic Dictionary of Law , 694 (1901) (Place of Business: "The term implies a particular place appropriated exclusively to a local business.") (citing 38 Tex. 599).

Here, too, definitions may prove helpful in ensuring proper application of the statutory scope. Business , The Century Dictionary , 732 (1903) ("Specifically-4. Mercantile pursuits collectively; employments requiring knowledge of accounts and financial methods; the occupation of conducting trade or monetary transactions of any kind."); Business , Black's Law Dictionary (1891 ed.) (Business: "This word embraces everything about which a person can be employed. That which occupies the time, attention and labor of men for the purpose of a livelihood or profit. The doing of a single act pertaining to a particular business will not be considered engaging in or carrying on the business; yet a series of such acts would be so considered."). However, the Court considers it improper to unduly restrict its construction of the statute to permit proper venue to lie pursuant to the second half of § 1400(b) only in relation to businesses or types of business which were in existence at the time the statute was passed. No court in applying the statute, passed in 1897, would exclude from it airlines, automotive manufacturers, space transportation companies, nuclear power generators, television networks, or the various industries they support and which are supported by them.

Venue is assessed as of the time of filing of the complaint. See, e.g. , Raytheon Co. v. Cray , 258 F.Supp.3d 781, 787 (E.D. Tex. 2017), mandamus granted on other grounds, order vacated sub nom. In re Cray , 871 F.3d 1355 (Fed. Cir. 2017) (citing Hoover Grp., Inc. v. Custom Metalcraft, Inc. , 84 F.3d 1408, 1410 (Fed. Cir. 1996) ); Pers. Audio, LLC v. Google, Inc. , 280 F.Supp.3d 922, 931 (E.D. Tex. 2017).

While SEVEN brought suit against Google alleging infringement of certain claims in ten patents in this suit, Google only argues that SEVEN has failed to establish Google's commission of acts of infringement in this District as to three patents (the so-called '158, '433, and '812 Patents), leaving the other seven uncontested.

Nor do the alleged acts of infringement need be substantial or numerous. A single alleged act of infringement may be sufficient to properly establish venue. Rackman v. Texas Instruments, Inc. , 712 F.Supp. 448, 450 (S.D.N.Y. 1989) (finding "no support for [the] contention that 28 U.S.C. § 1400(b) requires more than 'de minimis' infringement").

Accord Plexxikon Inc. v. Novartis Pharm. Corp. , No. 17-cv-04405-HSG, 2017 WL 6389674, at *1, 2017 U.S. Dist. LEXIS 201984 at *3 (N.D. Cal. Dec. 7, 2017) (citing Cordis ); RegenLab USA LLC v. Estar Techs. Ltd , No. 16-cv-08771 (ALC), 2017 WL 3601304, at *2 n.2, 2017 U.S. Dist. LEXIS 131627, at *6 n.2 (S.D.N.Y. Aug. 17, 2017) ("[Defendants] assert in passing that they have not committed acts of infringement in the Southern District of New York, a requirement under the second prong of § 1400(b). With respect to infringement, at this stage, it suffices that [Plaintiff] alleges that each defendant made sales in New York of the product at issue.") (citing Cordis ); Ballard Med. Prods. v. Concord Labs., Inc. , 700 F.Supp. 796, 799 (D. Del. 1988) ("The allegation of manufacture of the prototype meets defendants' burden as to venue since courts have consistently held an allegation of infringement is itself sufficient to establish venue and the moving party is not required to demonstrate actual infringement by defendant's device.") (citing Cordis and Funnelcap, Inc. v. Orion Indust. Inc. , 392 F.Supp. 938, 941 (D.Del.1975) ; CAO Lighting, Inc. v. Light Efficient Design , No. 4:16-cv-00482-DCN, 2017 WL 4556717, at *2, 2017 U.S. Dist. LEXIS 170052 at *5 (D. Idaho Oct. 11, 2017) ("The parties do not dispute that CAO has alleged that Light Efficient Design has committed acts of infringement in Idaho. Therefore, the Court need only address whether Light Efficient Design has a regular and established place of business in Idaho."); see also 17 Moore's Federal Practice - Civil § 110.39 (2018) ("In [the] context of [post-TC Heartland § 1400(b) analysis], the requirement that the defendant commit an act of infringement in the proposed forum is not particularly troublesome. The patent statute defines acts of infringement to include making, using, or selling patented inventions without authority, or importing, selling, or using products made by patented process. This definition encompasses indirect as well as direct infringement. Traditionally, courts have required only an adequate allegation of infringement under the statute to assert venue.").

(Id. ("On its face, the Complaint is deficient because SEVEN only specifically identifies a single step purportedly performed by Google in this District for each of the asserted method claims for the '158, '433, and '812 Patents.") ).

See also Grant St. Grp., Inc. v. D & T Ventures, LLC , No. 10-1095, 2012 WL 13694, at *5 n. 5, 2012 U.S. Dist. LEXIS 505, at *15 n.5 (W.D. Pa. Jan. 4, 2012) (rejecting an application of NTP in "a personal jurisdiction analysis," and noting that "[NTP ] speaks to the merits of the infringement claim").

As SEVEN notes, "[t]he Federal Circuit did not hold, and has never held, that when a defendant carries out the steps of a method claim in multiple districts, there can be no act of infringement in any of them .... Such a ruling would be nonsensical, as it would mean that an act of infringement could occur within the United States without taking place in any district in the United States." (Dkt. No. 141 at 28). Google responds to this argument by noting that this result "does not eviscerate the venue statute as venue would still be proper in the district where the defendant resides," (Dkt. No. 148 at 9), and confirmed this position at argument. (Dkt. No. 193 at 26:24-27:7 ("THE COURT: So with a method claim, as long as an infringer made sure that all the steps weren't practiced in the same district, they could never properly be sued anywhere? [ ] Is that the -- is that the logical extension of your argument? MR. VERHOEVEN: That is an issue that would need to be dealt with."), 28:1-9 ( [MR. VERHOEVEN:] "I would say that even if you had a method claim where each of the steps was in a different venue, you can still sue somebody in the state of incorporation. So there's two prong-there's two ways that you can get venue, and-and so-THE COURT: So instead of there never being a place where you could get venue, you would be limited only to the state of incorporation. MR. VERHOEVEN: Yes. Yes, Your Honor.") ). However, the result required by Google's reading of the statute undoubtedly forecloses the ability of a plaintiff to avail itself of half of the special patent venue statute. This would do violence to the statutory venue grant. That is the world § 1400(b) was intended to leave behind. Indeed in its authoritative discussion on the underlying purpose and policy of § 1400(b) in In re Cray , the Federal Circuit noted that the requirement of some courts (equivalent to the position Google urges here) which made it "necessary to sue a defendant in its place of incorporation, and 'the corporations thus have an opportunity to infringe upon patents and almost escape any responsibility for it by reason of the difficulty of finding them in order to sue them, for it is very inconvenient to travel across the continent to sue them when they are infringing in a business established near the plaintiff or owner of a patent,' " was abrogated by § 1400(b), which, "of course[,] allows broader venue than merely the place of a defendant's incorporation." 871 F.3d at 1361 (citing 29 Cong. Rec. 2719 (1897) (statement of Sen. Platt) and Brunette Mach. Works, Ltd. v. Kockum Indus., Inc. , 406 U.S. 706, 713 n.13, 92 S.Ct. 1936, 32 L.Ed.2d 428 (1972) ). Accordingly, Google's supposed preservation of the venue statute leaves little of the "broader" § 1400(b) provision standing and must be rejected.

The Blackbird court also accepted the Defendants' representation that the allegedly infringing apparatus was "made" in the proposed forum.

(See Dkt. No. 34 at ¶¶ 47 ("Google infringes at least claim 10 of the '158 Patent under at least 35 U.S.C. § 271(a). Google, for example, practices every step of at least claim 10 in the United States, including steps that it practices in this District."), 79 ("Google infringes at least claims 1 and 16 of the '433 Patent under at least 35 U.S.C. § 271(a) and (b). Google makes, uses, sells, offers to sell, or imports into the United States the Google Play store which meets every limitation of at least claim 1. Further, Google, for example, practices every step of claim 16 in the United States, including steps that it practices in this District."), 86 ("Google infringes at least claims 1 and 10 of the '812 Patent under at least 35 U.S.C. § 271(a) and (b). Google, for example, practices every step of at least claim 1 in the United States, including steps that it practices in this District. Further, Google makes, uses, sells, offers to sell, or imports into the United States servers that meet every limitation of at least claim 10.") ).

See also Jeffrey Galion, Inc. v. Joy Mfg. Co. , 323 F.Supp. 261, 266-67 (N.D. W. Va. 1971).

This view is repeated by commentators and case law alike. 60 Am. Jur. 2d Patents § 747 ("The regular and established place of business does not need to be a business connected with the alleged infringement."); Cabot Corp. v. WGM Safety Corp. , 562 F.Supp. 891, 892 (D. Mass. 1983) ("I do not read § 1400(b) as requiring that there be some connection between the acts of infringement alleged and the regular and established place of business within this district."); see alsosupra , at 942.

The Court notes that, to the extent Google objects to the inclusion of system claims of the objected-to patents in the acts of infringement analysis, the Court declines to address that issue at this time. (See Dkt. No. 125 at 25 ("SEVEN also asserts a system claim of the '433 Patent (claim 1), which recites "a first server" and "a second server." While SEVEN alleges "[c]ertain Google Play servers" may perform the recited functionality, it does not allege that any of these servers are in this District, that the servers or the accused functionality was made, designed, or developed in this District, or that Google has committed acts of infringement in this District.") (citations omitted). First, Google makes no effort to define the full scope of the system at issue in the '433 Patent, even though the system specifically includes mobile devices. See U.S. Pat. No. 9,386,433 at 20:2-5 ("1. A system for providing mobile network services comprising: a first server communicatively coupled to a mobile device over a mobile network ..."). It may well be that one part of the system (the Google Play servers) is not present in this District; this argument says nothing about other clearly identified parts of the system specifically alleged to be present and infringing by SEVEN. (Dkt. No. 34 at ¶ 81 ("When using the Google Play app, one or more of these servers are communicatively coupled to a user's mobile device over a mobile network such as 3G, LTE, or WiFi."); id. at ¶ 82 (identifying "end users in this District"). And it cannot be disputed that the system's various parts must all be considered in any analysis of infringement. See Intellectual Ventures I LLC v. Motorola Mobility LLC , 870 F.3d 1320, 1328 (Fed. Cir. 2017) (requiring "the patentee to demonstrate that the direct infringer obtained 'benefit' from each and every element of the claimed system"). Accordingly, the Court may properly hold that some alleged infringement of the system claim has occurred within this District and may find that partial alleged infringement sufficient to meet the acts of infringement requirement as to the system claim. Blackbird Techs., 2017 WL 4543783, 2017 U.S. Dist. LEXIS 167860. Second, to the extent that this is insufficient to establish acts of infringement under § 1400(b) as to the system claim of the '433 patent, the Court holds that it may exercise pendent venue over any claims of a single patent where the Court has found proper venue as to at least one claim of that patent.

(Dkt. No. 141 at 2-8 (cleaned up) ). This general background section is directly quoted from SEVEN's briefing. This is necessary to provide the factual framework within which the Court operates in this analysis and its direct quotation from the Plaintiff's briefing is largely a function of Google not providing any general overview of its business operations and how its Edge Network functions/supports its core business functionalities. While it is in Google's interests to minimize how its Edge Network and Google Global Cache ("GCC") servers operate within, support, and benefit its various business functionalities in order to support its contentions that it does not "do business" through its Edge Network and GCC servers, SEVEN's statements are, generally, not contradicted or otherwise undermined by Google in either its Motion or Reply. This section is intended to 'set the stage' for the specific fact-intensive analysis the Court must undertake in its application of the statute to the case at bar.

Google disputes this characterization. (Dkt. No. 148 at 3 ("GGC servers are not warehouses.") ). This is a principal objection and will be addressed infra.

Google disputes this characterization. (See Dkt. No. 148 at 1 ("There is no 'regular and established place of business' ") ).

Google disputes this characterization. (See Dkt. No. 148 at 1 ("There is no 'regular and established place of business' ") ).

Google disputes that it leases anything. (Dkt. No. 148 at 5 ("Google does not own, lease, or otherwise exercise possession or control over the ISPs' buildings or rooms housing the GGC servers in this District") ). This is a principal objection and will be addressed infra.

Google disputes that it leases anything. (Dkt. No. 148 at 5 ("Google does not own, lease, or otherwise exercise possession or control over the ISPs' buildings or rooms housing the GGC servers in this District") ). This is a principal objection and will be addressed infra.

Other courts examining similar facts have reached the same conclusion as this Court now reaches. Peerless Network, Inc. v. Blitz Telecom Consulting, LLC , No. 17-CV-1725 (JPO), 2018 WL 1478047, at *3 (S.D.N.Y. Mar. 26, 2018) (holding that "a shelf containing a piece of Local Access's telecommunications equipment" "is a 'physical place in the district' insofar as it is '[a] building or a part of a building set apart for any purpose.' ") (citing In re Cray , 871 F.3d at 1362 ).

Accordingly, the concern expressed in Personal Audio that "[m]aybe even every handheld device sold by Verizon would become a place of business for Verizon because the end-user signed an agreement with Verizon regarding Verizon's exclusive control of the device," is clearly seen to be too far afield from the statutory text. 280 F.Supp.3d at 934. Such a holding could not be supported by proper application of the law; proper reading of the statute, guided by In re Cray. Such would adequately prevent the "distort[ion] of the statute" feared by the Personal Audio court. Id.

Which may well constitute "merely" a "virtual space" without more and, thus, not meet the statutory requirement. For example, while an Amazon Web Services data center may be located in a particular district, an online business which utilizes Amazon's cloud web hosting solution on the terms offered by Amazon and without any physical equipment of its own present within the data center would, undoubtedly, not be subject to proper venue under § 1400(b) in that district.

The Suddenlink Agreement is only one instance of GGC agreements existing between Google and ISPs within the Eastern District of Texas. The Court discusses it as an exemplar. Such GGC agreements also include Google's agreement with CableOne, an ISP that hosts three GGC servers in Sherman, Texas, and three GGC servers Texarkana, Texas. (Dkt. No. 141 at 19 ("Google GGC servers have been operating (i) in Tyler under the Global Cache Agreement with Suddenlink since at least December 2015 and (ii) in Sherman and Texarkana under the agreement with CableOne since at least August 2015") (citations omitted) ).

(See Dkt. No. 141-23 at 6 ("Space: The Host shall provide Google rack space for the Equipment located at the Space within Host premises.") ).

This conclusion is buttressed by statements made by Google at argument on the instant Motion. Google agrees that "all virtual space has to have [associated] hardware." (Dkt. No. 193, Hr'g Tr. (sealed) at 15:2). Google admits that it owns the server. (Id. , Hr'g Tr. (sealed) at 7:14-16 ("THE COURT: Would you agree that Google owns the server? MR. VERHOEVEN: Yes.") ). Google agrees that Google possesses a "right" for its server to be "placed" in and occupy the ISP's "physical location" by means of the Suddenlink agreement and that without the agreement "its server would be trespassing on someone else's property." (Id. , Hr'g Tr. (sealed) at 7:17-8:4 ("THE COURT: And would you agree that Google acquires the right for its server to be placed in the ISP's physical location by means of this agreement? MR. VERHOEVEN: Yes. Yes, Your Honor. THE COURT: And without the agreement, Google's property, its server, would be trespassing on someone else's property, correct? MR. VERHOEVEN: I mean, that's a hypothetical, Your Honor. THE COURT: Well, there would be no right to be there outside of this agreement? MR. VERHOEVEN: As a general principle, yes, you never have a right to invade somebody else's prop - real estate property ...") ). There is no other basis for permitting the GGC server to reside within the ISP separate and apart from the Suddenlink Agreement. (Id. , Hr'g Tr. (sealed) at 8:17-21 ("THE COURT: You're not pointing to any other document or any other basis outside of this, as you call it, hosting agreement to support Google's right to have its property housed at these locations, correct? MR. VERHOEVEN: I guess I'm not, Your Honor.") ). The ISPs are "not allowed to open the server. You're not allowed to manipulate the server. You're not allowed to unscrew the form factor and take it apart." (Id. , Hr'g Tr. (sealed) at 10:14-17 (MR. VERHOEVEN) ).

The Court notes that this conclusion is able to be reached largely due to the venue discovery Ordered by the Court in this case. (Dkt. No. 107). With the recent decision by the Federal Circuit establishing that "the Plaintiff bears the burden of establishing proper venue," In re ZTE , 890 F.3d at 1013, as opposed to the defendant bearing the burden to establish improper venue, the Court anticipates it will commonly be asked to permit, on motion, a similar, targeted discovery process to ensure it is able to have a complete picture of the underlying venue facts before attempting to apply the statutory requirements of § 1400(b).

State v. Woods , 242 Ala. 184, 189, 5 So.2d 732, 736 (Ala. 1942) ("We may observe, as a matter of common knowledge, that many places of business rent space in their establishments to third persons who may and do conduct their own and different businesses in such space or department so rented. Such space or department becomes, and is, a separate place of business,--the business of such third party. If, therefore, a vending machine owner rents (method of payment immaterial) space for a vending machine and such space becomes his place of business (special or limited), in the conduct of his business he thereby makes himself ...."); Vending Mach. Corp. v. Okla. Tax Comm'n (In re Cigarette Licenses of the Vending Mach. Corp. ), 1938 OK 463, ¶ 6, 183 Okla. 427, 429, 82 P.2d 1069 (Okla. 1938) (noting that, in discussing whether two cigarette vending machines in the same location constituted one or two places of business for licensing purposes, "[t]he Legislature has not said that one who sells by means of mechanical devise shall pay more or less than one who sells through the medium of personal salesmanship. It declares that there shall be a separate license for each place of business; and 'place of business,' says the Legislature, 'shall be construed to include the place where orders are received, or where cigarettes are sold.' Then, in the following words, each vending machine is in effect declared to be a place of business: 'Vending machines shall be licensed as a place of business and each and every cigarette vending machine shall have a separate license for each machine from which cigarettes are dispensed.' So far as the classification is concerned, the statute makes no attempt to bring into play any of the usual regulatory measures employed under the police powers. Neither is there an attempt to distinguish or classify upon the basis of volume of business, value of merchandise, capital invested, or mode of dispensing to the trade.... In the instant case each vending machine is a complete unit dispensing cigarettes at retail, a complete retail establishment. Each exercises the privilege granted to any other retail dispensary of cigarettes."); Los Angeles v. Amber Theatres, Inc. , 123 Cal. App. 3d 715 n.4, 176 Cal.Rptr. 850, 852 (Cal. Ct. App. 1981) ("While 'penny arcade' is not defined for zoning purposes in the Municipal Code, Webster's Third New International Dictionary states that HN1 a 'penny arcade' is an amusement center where each device for entertainment may be operated for a penny. The fact that a penny may not be used today to operate these devices has no effect on the basic definition. We would interpret a 'penny arcade,' for zoning purposes, to mean a place of business devoted primarily or in some substantial degree to maintaining coin- operated amusement machines and devices for the purpose of providing public entertainment."); Hartney Fuel Oil Co. v. Hamer , 2013 IL 115130, ¶ 54, 376 Ill.Dec. 294, 998 N.E.2d 1227 (2013) ("Three additional provisions define 'the seller's place of business' or 'where the seller is engaged in business' " (referencing 86 Ill. Adm. Code 220.115(f) (sales through vending machines) ("A retailer is engaged in the business of selling food, beverages or other tangible personal property through a vending machine at the location where the vending machine is located when the sale is made if: i) the vending machine is a device operated by coin, currency, credit card, token, coupon or similar device that dispenses food, beverage or other tangible personal property; ii) the food, beverage or other tangible personal property is contained within the vending machine and dispensed from the vending machine; and iii) the purchaser takes possession of the purchased food, beverage or other tangible personal property immediately.) ).

For example: unattended gas pumps, vending machines, automated car washes, bike share kiosks, etc. See also Automated Retail, Wikipedia (available at https://en.wikipedia.org/wiki/Automated_retail).

The Court recognizes that Apple has recently urged similar arguments in a currently pending motion, Alert Signal Intellectual Property, LLC v. Apple Inc. , No. 2:18-cv-177-JRG, Apple's Motion to Dismiss for Improper Venue (Redacted Version), Dkt. No. 19 at 1, 5. The above argument is presented for illustration and the Court does not prejudge Apple's motion here. The Court will fully analyze and address those arguments in their entirety when that motion is ripe.

State v. Hutton , 39 Mo. App. 410, 416 (Mo. Ct. App. 1890) ("This act, as amended by the act of March 24, 1887, recites: 'No such license shall authorize any merchant to sell vinous, fermented or spirituous liquors in any quantities, to be drank at his store, stand or warehouse, or other place of business. ' ") (quotation omitted) (emphasis added); Kansas City v. Butt , 88 Mo. App. 237, 238 (Mo. Ct. App. 1901) ("that defendant, as manager of said corporation, was engaged in the manufacture and production of ice by artificial means; that no place of business, depot or warehouse was kept for the selling of ice .") (emphasis added); Gregory v. Wabash Ry. Co. , 46 Mo. App. 574, 577 (Mo. Ct. App. 1891) ("Hutchinson on Carriers, section [89], thus clearly states the law: ... 'But, if the delivery be made at the warehouse or other place of business of the carrier for as early transportation as can be made in the course of the carrier's business, and subject to only such delays as may necessarily occur in awaiting the departure of trains, ... or from the performance of prior engagements by him, he becomes, the moment the delivery is made, a carrier as to the goods, and his responsibility as such at once attaches.' ") (citation omitted) (emphasis added); Woods v. Postal Tel. Cable Co. , 205 Ala. 236, 241, 87 So. 681, 685 (Ala. 1920) (" 'improvements,' as used in a lease which provided that all improvements of the building shall belong to the landlord at the expiration of the term, may be said to 'comprehend everything that tends to add to the value or convenience of a building or a place of business, whether it be a store, manufacturing establishment, warehouse, or farming premises. ' ") (citation omitted) (emphasis added); City of Newport v. French Bros. Bauer Co. , 169 Ky. 174, 183 S.W. 532, 534 (Ky. 1916) ("the appellee at no time ever had any goods not sold previous to the time of delivery in Kentucky, and had never maintained any warehouse, storeroom, or other place of business in Kentucky") (emphasis added); Hasselbring v. Koepke , 263 Mich. 466, 480, 248 N.W. 869, 873 (Mich. 1933) ("In other words, the nature and extent of the right is to have that amount of light through the windows of the dominant house which is sufficient, according to the ordinary notions of mankind, for the comfortable use and enjoyment of the house as a dwelling-house, if it be a dwelling-house, or for the beneficial use and occupation of the building if it be a warehouse, shop, or other place of business. ") (citing 11 Halsbury's Laws of England, p. 300) (emphasis added); Huebner-Toledo Breweries Co. v. Mathews Gravity Carrier Co. , 253 F. 435, 442 (6th Cir. 1918) ("Palmer obtained a patent in 1888, No. 376,340, on an elevator, which may properly be regarded as a distributing contrivance; it was designed for carrying goods or other materials up or down in a warehouse, store, manufactory, or other similar place of business .") (emphasis added); J.B. Van Sciver Co. v. Flurer , 167 A. 513, 513 (N.J. Dist. Ct. 1933) ("It maintains no warehouse, factory, general offices, or other place of business outside the state of New Jersey ") (emphasis added); Wagner v. City of Covington , 177 Ky. 385, 197 S.W. 806, 807 (Ky. 1917), aff'd, 251 U.S. 95, 40 S.Ct. 93, 64 L.Ed. 157 (1919) ("appellants have no warehouse or other place of business in Covington ") (emphasis added); Hill Mfg. Co. v. New Orleans , M. & C.R.R. Co., 117 Miss. 548, 78 So. 187, 191 (Miss. 1918) ("The rule is stated in section 113 of Hutchinson on Carriers, vol. 2, as follows: 'But if the delivery be made at the warehouse or other place of business of the carrier for as early transportation as can be made in the course of the carrier's business, ... he becomes, the moment the delivery is made, a carrier as to the goods") (emphasis added); Wingfield v. Kutres , 136 Ga. 345, 71 S.E. 474, 475 (Ga. 1911) ("Section 2 prescribed a license fee of $500 for each calendar year or part thereof to be paid by every person, firm, or corporation who shall maintain a supply depot, warehouse or distributing offices or other place of business within the limits of this state") (emphasis added); Inhabitants of Abington v. Inhabitants of N. Bridgewater , 40 Mass. 170, 177 (Mass. 1839) ("if it be his place of business, he may have a warehouse, manufactory, wharf or other place of business, in connexion with his dwellinghouse in different towns .") (citing Lyman v. Fiske , 34 Mass. 231, 231, 17 Pick. 231 (Mass. 1835) ) (emphasis added); Flynn v. Colonial Disc. Co. , 149 Misc. 607, 610, 269 N.Y.S. 394 (City Ct. 1933) ("His storage room is in effect as much a part of his place of business as is his showroom. A sale from his warehouse is in fact a sale 'in the ordinary course of business .' ") (emphasis added); Grantham v. City of Chickasha , 1932 OK 123, 156 Okla. 56, 9 P.2d 747, 748 (Okla. 1932) ("The ordinance, in part, provides as follows: 'Ordinance No. 1032.... Section Two (2): ... That the term itinerant merchant as herein used in this ordinance, shall be deemed to mean and include any and all itinerant vendors, ... who have no fixed or established store, warehouse, or other place of business within the City of Chickasha.' ") (emphasis added); Morgan v. State , 140 Ga. 202, 78 S.E. 807, 807 (Ga. 1913) ("The Court of Appeals has certified to the Supreme Court the following question[ ]: ... Is the said act in conflict with the fourteenth amendment of the Constitution of the United States in that: (a) The act imposes a greater tax upon persons maintaining 'a supply depot, warehouse, distributing office, or other place of business within this state ...' ") (emphasis added). In re BigCommerce , 890 F.3d at 983 (Fed. Cir. 2018) (approving of "the general principle of statutory construction that 'where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary.") (citing Standard Oil Co. v. United States , 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

This common view of warehouses as places of business continued throughout the 20th century. See, e.g. , Fed. Elec. Prod. Co. v. Frank Adam Elec. Co. , 100 F.Supp. 8, 10 (S.D.N.Y. 1951) ("Defendant has a number of what it terms 'reshipping centers' spaced around the country. One of these is located in New York City. Defendant describes its function as 'incidental to the filling of orders for goods manufactured and sold in Missouri, by expediting delivery thereof to purchasers along the Atlantic Seaboard.' It denies that the New York operation constitutes a regular and established place of business within the meaning of Section 1400(b).... The mechanics of bookkeeping which invoiced these orders in St. Louis, do not alter the nature of defendant's New York office. It is a regular and established business within the meaning of Section 1400(b) .") (emphasis added); New Wrinkle v. Fritz , 30 F.Supp. 89, 90-91 (W.D.N.Y. 1939) ("Defendant corporation's plant is located at Pontiac, Michigan. It has no office for the transaction of business in this district. It has no warehouse within this district.... The foregoing facts do not show that the defendant corporation has 'a regular and established place of business' in this district." ) (emphasis added); E. H. Sheldon & Co. v. Norbute Corp. , 228 F.Supp. 245, 246-47 (E.D. Pa. 1964) ("Neither defendant nor Metalab owns, leases or otherwise controls any office, warehouse or other permanent location in this district .... In the present case the defendant does not maintain, control or pay for an establishment in this district. It has no regular and established place of business here . The suit, therefore, cannot be maintained here.") (emphasis added); Holub Indus., Inc. v. Wyche , 290 F.2d 852, 853 (4th Cir. 1961) ("It has no regular or established place of business or office or warehouse of any kind in South Carolina and is not registered to do business in that state.") (emphasis added); Brevel Prod. Corp. v. H & B Am. Corp. , 202 F.Supp. 824, 827 (S.D.N.Y. 1962) ("An essential prerequisite for a finding of venue in cases of this sort is that the defendant actually maintains, in the words of the statute, 'a regular and established place of business' within the district. This 'place of business' can be a branch office, a sales-showroom, or a warehouse o[r] distribution center. But it must be maintained and paid for by the defendant. The mere fact that defendant hires a sales representative who in turn rents offices to sell defendant's products is insufficient.") (citations omitted) (emphasis added). Indeed, warehouses are commonly viewed as "integral" to the conduct of business and business purposes. See, e. g. , In re McCrary's Farm Supply, Inc. , 705 F.2d 330, 334 (8th Cir. 1983) ("Employees of Central Terminal Warehouse did not solicit business for McCrary's. They did, however, perform stock transfers for McCrary's and assist in making merchandise available for pick up either by McCrary's, its customers, or common carriers. Sales involve more than simply solicitation, and we are satisfied that Central Terminal, in contributing to the storage and distribution of merchandise, performed an integral part of McCrary's sales activity and business. ") (emphasis added).

But see CDx Diagnostic, Inc. v. United States Endoscopy Grp., Inc. , No. 13-CV-5669(NSR), 2018 WL 2388534, at *3 (S.D.N.Y. May 24, 2018) ("[S]torage units are not 'regular and established places of business', because Plaintiffs have failed to demonstrate that Defendant 'actually engage[s] in business from [either] location.' The question is whether the storage units are 'location[s] at which one carries on a business.' They are not. While Defendant's customer service reps may 'typically' retrieve materials from the storage units to visit customers within this District, no 'employee or agent of [Defendant actually] conduct[s] business at' the storage units, whatsoever.") (citations omitted).

See https://services.amazon.com/fulfillment-by-amazon/benefits.html ("With Fulfillment by Amazon (FBA), you store your products in Amazon's fulfillment centers , and we pick, pack, ship, and provide customer service for these products."); see also Amazon.com, Inc., 2017 Annual Report at 3 ("We offer programs that enable sellers to grow their businesses, sell their products on our websites and their own branded websites, and fulfill orders through us. We are not the seller of record in these transactions. We earn fixed fees, a percentage of sales, per-unit activity fees, interest, or some combination thereof, for our seller programs."); id. at 8 ("Under some of our commercial agreements, we maintain the inventory of other companies, thereby increasing the complexity of tracking inventory and operating our fulfillment network.").

Id. at 479 (holding a mail order drug business, run from a residence in Windsor, Canada, but with a warehouse in Detroit, Michigan, with "All orders filled promptly and completely from [the] Detroit warehouse, duty paid," is a regular and established place of business for purposes of venue in a patent case, even though the warehouse "does not receive orders directly from customers or enter into contracts with them, or receive any money in payment of bills; and ... has no authority so to do."), at 480-81 ("If what is done at the warehouse at Detroit, and in that city, looking to the delivery of the goods, were subtracted from what is done in Windsor, appellant could not conduct his present business at all. We need not repeat that he has no other warehouse, no other representative, and no stock of goods through which to conduct business, except only at the Woodward avenue warehouse in Detroit. Now, despite the fact that the preliminary steps are taken at Windsor, it is plain enough that the final and essential acts of infringement in issue are committed by [a warehouse employee] at the warehouse in Detroit, and through his dealings with the carriers at the warehouse and elsewhere within that city. [The warehouse employee] thus does something with respect to the business upon which the suit is founded. [The warehouse employee] is there in the right of appellant, and [The warehouse employee]'s acts are appellant's acts; and to say that appellant has 'no regular and established place of business' there is to ignore the use that has been made for years of the Woodward avenue warehouse.").

See , e.g. , Lisa Fickenscher, "Amazon is finally opening one of its mega-warehouses in New York" (June 19, 2017) (available at https://nypost.com/2017/06/19/new-yorkers-are-getting-faster-shipping-thanks-to-amazon/, accessed on July 11, 2018) ("Amazon's ability to quickly ship stuff to New Yorkers, from Kindle readers to kayaks, is about to get a major boost.... The Amazon 'fulfillment center' will span nearly 1 million square feet on the west shore of Staten Island, amping up Amazon's access to millions of online shoppers in Manhattan, Brooklyn, Queens and Long Island, sources close to the situation said.... In December 2014, Amazon opened a 40,000-square-foot 'Prime Now' hub - filling urgent orders for beer, shampoo and printer cartridges within a few hours with the help of bike couriers - at 7 W. 34th St. in Manhattan.").

This type of close storage location is seen in a variety of fields and industries. See, e.g. , Dept. of Energy, Strategic Petroleum Reserve Storage Sites (available at https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/spr-storage-sites ) ("Storage locations along the Gulf Coast were selected because they provide the most flexible means for connecting to the Nation's commercial oil transport network. Strategic Reserve oil can be distributed through interstate pipelines to nearly half of the Nation's oil refineries or loaded into ships or barges for transport to other refineries."); Edward T. O'Donnell, The Dawn of New York's Ice Age , N.Y. Times (July 31, 2005) (available at https://www.nytimes.com/2005/07/31/nyregion/thecity/the-dawn-of-new-yorks-ice-age.html ) ("1855 ... brought the incorporation of the Knickerbocker Ice Company, an enterprise that quickly became the city's largest supplier. Knickerbocker developed a massive ice harvesting operation at Rockland Lake in Nyack and along the banks of the upper Hudson River, and during the winter months it employed thousands of men to cut huge blocks of ice and haul them to scores of large ice warehouses. When the warm weather set in, barges carried the product to the Manhattan docks, where it was transferred to icehouses dotted around the city and then distributed to customers via ice wagons.").

See Alphabet, Inc., 10-K (2017 fiscal year) (available at https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf ) at 53 ("We generate revenues primarily by delivering relevant, cost-effective online advertising"), at 4 ("The goal of our advertising business is to deliver relevant ads at just the right time and to give people useful commercial information, regardless of the device they're using."), at 3 ("The Internet is one of the world's most powerful equalizers, capable of propelling new ideas and people forward. At Google, our mission is to make sure that information serves everyone, not just a few. So whether you're a child in a rural village or a professor at an elite university, you can access the same information. We are helping people get online by tailoring digital experiences to the needs of emerging markets. We're also making sure our core Google products are fast and useful, especially for users in areas where speed and connectivity are central concerns. ").

The Court notes with interest the ironic positions Google takes in its Motion. While clearly taking the position that "Servers are pieces of equipment ... and do not rise to the level of being places of business," (Dkt. No. 125 at 10- 11), it also represents that "the Google applications and services named in the Complaint are provided by Google servers in Google data centers located outside this District." (Id. at 17). Google continues, stating that the alleged infringement by Google , cannot have occurred within this District because "Google has no data centers in this District." (Id. at 18-19). Google cannot argue that it both does business at and through servers in its data centers while plausibly maintaining that servers themselves cannot be places of business.

At argument on this Motion, Google went further, refusing to concede that a place with Google employees present at it constituted proper venue under the statute. (Dkt. No. 193, Hr'g Tr. at 20:4-12 ("THE COURT: If Google has a place with employees present, is it subject to venue there? MR. VERHOEVEN: That'd be a much closer call, Your Honor. It would depend specifically on the facts and circumstances. Certainly, if Google had an office that had a sign on it and people could walk in, customer - or business customers could walk in, not necessarily retail people -- or retail people, then that would be - probably be a place of business.").

See Place of Employment , Black's Law Dictionary (10th ed. 2014) ("The location at which work done in connection with a business is carried out; the place where some process or operation related to the business is conducted.") (emphasis added).

Interestingly, this result was not as broad as the financial services industry proposed. See Patent Reform: The Future of American Innovation: Hearing Before the S. Comm. on the Judiciary , 110th Cong. 291 (2007) (Testimony of John A. Squires on behalf of the American Bankers Assn., et al.) (commenting on the Patent Reform Act of 2007 (which redefined "resides" for § 1400(b) to exclude the definition found in § 1391(c) ), and arguing that "[i]t is appropriate to create a test whereby both parties have [a] substantial business nexus in the judicial district or otherwise constrained by this statute. Financial firms do not want to be open to suit in any and all districts due simply to the presence of a branch or an ATM."). Even so, at least one commentator views this limited exemption as a "bank bailout." Lawrence A. Kogan, Commercial High Technology Innovations Face Uncertain Future Amid Emerging "Brics" Compulsory Licensing and IT Interoperability Frameworks , 13 SAN DIEGO INT'L L.J. 201, 300 (2011) (noting "the provision in the [AIA] excluding ATM machines as a venue tool") (citing AIA Sec. 18(c) ).

H.R. Rep. No. 112-98, pt. 1, at 81 (2011) ("Subsection (c) deems that in an action for infringement under § 281 of a covered business method patent, an automated teller machine ('ATM') shall not be considered a regular and established place of business for purposes of the patent venue statute.") (citing 28 U.S.C. § 1400(b) ).

The precedent of the Temporary Emergency Court of Appeals, eventually replaced by the Court of Appeals for the Federal Circuit, has been adopted by the Court of Appeals for the Federal Circuit to some extent. See Tex. Am. Oil Corp. v. United States Dep't of Energy , 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc) ("[T]he Court of Appeals for the Federal Circuit adopts as precedent the body of law represented by the holdings of the Temporary Emergency Court of Appeals."); but see Marriott Int'l Resorts, L.P. v. United States , 437 F.3d 1302, 1306 n.4 (Fed. Cir. 2006).

Hence, "automated."

(See Dkt. No. 193, Hr'g Tr. at 20:17-22 ( [MR. VERHOEVEN:] "In this case, there are no Google employees. In fact, there's no record that any Google employee has ever been to any of the ISPs identified by SEVEN in this motion. Google employees don't have access. They'd have to get permission to enter."), at 23:3-7 ( [MR. VERHOEVEN:] "Google owns the servers. Google owns the software. Google controls what can be done with the servers. It doesn't control what rack they're put on. But it-but it does control-they can't open up these servers. They can't mess with them.") ).

Additional statements from that website further confirm the ratification by Google. (See Dkt. No. 141-13 at 2 ("Google's network infrastructure has three distinct elements: Core data centers, Edge Points of Presence (PoPs), Edge caching and services nodes (Google Global Cache, or GGC)"), at 5 ("Edge nodes (Google Global Cache, or GGC) Our edge nodes (called Google Global Cache, or GGC) represent the tier of Google's infrastructure closest to our users. With our edge nodes, network operators and internet service providers deploy Google-supplied servers inside their network. Static content that is very popular with the local host's user base, including YouTube and Google Play, is temporarily cached on edge nodes. Google's traffic management systems direct user requests to an edge node that will provide the best experience. In some locations, we also use our edge nodes to support the delivery of other Google services, such as Google Search, by proxying traffic where it will deliver improved end-to-end performance for the end user.") ). Google also presents a "[m]ap of metros where at least one Edge node (GGC) is present," id. , which identifies the GGCs located at least in Tyler and Sherman. (Dkt. No. 141 at 24 (citing Dkt. No. 141-13) ). A portion of this map has been reproduced below (with the yellow dot west of Tyler indicating the presence of the Edge node (GGC) ):

With regard to a current analysis of what constitutes "business" within the language of the statute, recent guidance from the Supreme Court appears to caution against ignoring the state of the modern economy. S. Dakota v. Wayfair, Inc. , --- U.S. ----, 138 S.Ct. 2080, 2093, --- L.Ed.2d ---- (2018) ("[T]he Court should focus on rules that are appropriate to the twenty-first century, not the nineteenth.") (citations and internal quotations omitted), at 2095 ("[I]t is not clear why a single employee or a single warehouse should create a substantial nexus while 'physical' aspects of pervasive modern technology should not."), at 2095 ("The 'dramatic technological and social changes' of our 'increasingly interconnected economy' mean that buyers are 'closer to most major retailers' than ever before-'regardless of how close or far the nearest storefront.' Between targeted advertising and instant access to most consumers via any internet-enabled device, 'a business may be present in a State in a meaningful way without' that presence 'being physical in the traditional sense of the term.' A virtual showroom can show far more inventory, in far more detail, and with greater opportunities for consumer and seller interaction than might be possible for local stores.") (internal citations omitted); see also id. at 2096-99.

In addition to the analysis presented herein, the Court accepts each aspect of SEVEN's opposition to the Motion in support of this Order's conclusion. (Dkt. Nos. 141, 154).